# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EARNEST SCOTT, JR.** | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| **PHILADELPHIA DEPARTMENT OF** | : | |
| **PRISONS, WARDEN GERALD MAY,** | : | |
| **C/O CARMONA, C/O COFIELD, C/O** | : | |
| **LAWRENCE, and MAJOR BELLA** | : | NO. 18-71 |

## MEMORANDUM OPINION

**Savage, J.**  April 3, 2019

Plaintiff Earnest Scott's claims arise from an alleged assault by three correctional officers while he was an inmate at the Philadelphia Prison System's (PPS) Curran-Fromhold Correctional Facility (CFCF). Scott avers that the City violated the Americans with Disabilities Act (ADA) when it disciplined him without accounting for the role his mental illness played in his alleged misconduct. He also claims that the City failed to train its correctional officers to deal with inmates behaving consistently with their mental illness. Against the officers, he asserts a claim for excessive force.

The City has moved to dismiss the two claims against it. It contends that Scott's ADA claim fails because he has not identified any program from which he was excluded on the basis of his disability. It argues that his Fourteenth Amendment failure to train claim also fails because he has not identified a municipal policy or custom, a policymaker, or any prior instances of misconduct caused by a failure to train.

**Facts**

According to his complaint, while incarcerated at CFCF, Scott was assaulted by three correctional officers whom he encountered while returning to his cell.[1] He alleges his auditory hallucinations led him to believe Correctional Officers Carlos Carmona, Desiree Lawrence and Ty Coffield were laughing at him.[2] He responded by calling Carmona "an unfortunate derogatory name."[3] As he continued walking toward his cell, he spoke with the hallucinatory voices.[4] Carmona punched Scott in the eye, knocking him down.[5] Lawrence and Coffield joined Carmona, "all [taking] turns punching, kicking, and stomping on Mr. Scott for a period estimated to be about 2 ½ minutes."[6]

Sergeant Bishop handcuffed Scott, took him to the cafeteria, and photographed his injuries.[7] Bishop placed him in disciplinary segregation.[8] Scott claims multiple disciplinary hearings were held during which video confirmed his version of the incident.[9] Nevertheless, he remained in segregation "due to his involvement (as a victim) in the assault" until he was transferred from CFCF seven months later.[10]

---

[1] Third Amended Complaint (TAC) (ECF No. 60) at ¶¶ 10, 15a.

[2] *Id.* at ¶¶ 15a-b.

[3] *Id.*

[4] *Id.* at ¶ 15c.

[5] *Id.* at ¶ 16.

[6] *Id.* at ¶ 17.

[7] *Id.* at ¶ 22.

[8] *Id.* at ¶ 32.

[9] *Id.* at ¶ 34.

[10] *Id.* at ¶¶ 34-35.

As a result of the assault, he suffered bruises to his face and ribs and visual disturbances.[11] He continues to have pain in his torso and posterior rib area.[12]

**Standard of Review**

A Rule 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint. To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

A conclusory recitation of the elements of a cause of action is not sufficient. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). The plaintiff must allege facts necessary to make out each element. *Id.* (quoting *Twombly*, 550 U.S. at 563 n.8). In other words, the complaint must contain facts which, if proven later, support a conclusion that a cause of action can be established.

In considering a motion to dismiss under Rule 12(b)(6), the court must first separate the factual and legal elements of a claim, accepting the well-pleaded facts as true and disregarding legal conclusions. The court next determines whether the facts alleged, if proven, show that the plaintiff has a plausible claim for relief. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679). In making this determination, all well-pleaded allegations of the complaint must be accepted

---

[11] *Id.* at ¶¶ 25, 28.

[12] *Id.* at ¶ 30.

3

as true and interpreted in the light most favorable to the plaintiff, and all inferences must be drawn in his favor. See *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009).

A court may consider only the complaint, exhibits attached to the complaint, matters of public record and undisputedly authentic documents to the extent the plaintiff bases his claims upon them. *Hartig Drug Co., Inc. v. Senju Pharm. Co., Ltd.*, 836 F.3d 261, 268 (3d Cir. 2016) (*citing Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)).

**Analysis**

*ADA Claim*

The ADA makes it unlawful for public entities, including prisons, to discriminate against the disabled in the provision of services, programs and activities. *Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.*, 796 F.3d 293, 301 (3d Cir. 2015) (citing *Tennessee v. Lane*, 541 U.S. 509, 517 (2004)); *Chisholm v. McManimon*, 275 F.3d 315, 325 (3d Cir. 2001) (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998)). To state a claim, a plaintiff must allege "that he is a 'qualified individual with a disability' [and] that he was excluded from a service, program, or activity of a public entity . . . because of his disability." *Disability Rights N.J., Inc.*, 796 F.3d at 301 (quoting 42 U.S.C. § 12102(1)(A)). Mental illness is a disability under the ADA. 42 U.S.C. § 12102(1)(A).

The City argues that Scott cannot make out an ADA cause of action because he fails to identify any prison program or service from which he was excluded.[13] Scott does not directly address the City's argument. Instead, he responds that disciplining an inmate

---

[13] Def.'s Memo. ISO Mot. to Dism. (ECF No. 66) at 6.

without accounting for his mental illness gives rise to a cause of action under the ADA.[14] In these circumstances, we do not agree.

In *Scherer v. Pennsylvania Department of Corrections*, cited by Scott, the court observed that the ADA applies to prisons providing "medical services."[15] No. 3:2004-191, 2007 WL 4111412, at *44 (W.D. Pa. Nov. 6, 2007) (quoting *Yeskey*, 524 U.S. at 209-10) (internal quotations omitted). In that case, an inmate placed in the prison's Restricted Housing Unit (RHU) as punishment for misconduct arising from his mental illness sued under the ADA. *Id.* The court stated that because his misconduct may have indicated a need for treatment, the prison's "lack of modification of its disciplinary procedures to account for and place the staff on notice of [his] mental illness . . . possibly resulted in a violation of the ADA *in the denial of necessary mental health treatment in response to his misconduct.*" *Id.* (emphasis added). However, the inmate could not maintain a claim based upon his punishment for misconduct arising from a mental illness. As the court explained, "[m]ental illness may contribute to misconduct but his placement was based upon misconduct, not because of a policy that those prisoners diagnosed with mental illness are to be housed in the RHU." *Id.*

---

[14] Pl.'s Opp. to Mot. to Dism. (ECF No. 67) at 8.

[15] Scott also cites *Purcell v. Pennsylvania Department of Corrections*, No. 00-181J, 2006 WL 891449 (W.D. Pa. Mar. 31, 2006) and *Biselli v. County of Ventura*, No. 09-08694 (C.D. Cal. June 4, 2012) in support of his contention that a prison must "consider inmates' mental health during disciplinary proceedings." Pl.'s Opp. to Mot. to Dism. at 8. However, in *Purcell*, the prison's motion failed to address the inmate's ADA claims based upon an alleged failure to account for his Tourette's Syndrome when disciplining him for outbursts. 2006 WL 891449, at *13-14. Accordingly, the court allowed the claims to proceed. *Id.* at *14. In *Biselli*, the Central District of California held that a jury could find that an inmate's disciplinary segregation leading to his suicide violated the ADA because it "was punishment for behavior known to be related to his mental illness." No. 09-08694, at 24. The court cited no support for this proposition. *See id.* We do not find this out-of-circuit unreported case persuasive.

Although Scott initially pled that he did not receive treatment for mental illness at CFCF, he later withdrew these allegations.[16] Unlike the inmate in *Scherer*, he does not allege that his disciplinary segregation resulted in the withholding of treatment. Nor does he allege a policy of segregating mentally ill inmates or that he was placed in segregation because of his illness. Rather, he alleges that he was segregated "as the direct result" of his altercation with Carmona, Lawrence and Coffield.[17] Even if his mental illness contributed to his involvement in the altercation, he alleges that he was punished for his involvement in the altercation, not for having a mental illness. Accordingly, his ADA claim fails.

*Fourteenth Amendment Failure to Train Claim*

A municipality may be held liable under § 1983 for injuries inflicted by its agents or employees only if the injuries were the result of a governmental policy or custom. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)); *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 (3d Cir. 2010). A governmental policy or custom can be established by showing either that the decisionmaker possessing final authority to establish a municipal policy did so by issuing an official statement of policy or that a governmental custom developed when the official acquiesced to a course of conduct such that it operated as law. *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 250 (3d Cir. 2007). The plaintiff must also show a "conscious decision or deliberate indifference" on the part of the official. *Simmons v. City of Phila.*, 947 F.2d 1042, 1063 (3d Cir. 1991).

---

[16] Pl.'s Partial Vol. Dism. (ECF No. 63) at 2.

[17] TAC at ¶¶ 31, 34.

A § 1983 claim against a municipality may not be predicated on respondeat superior. *Monell*, 436 U.S. at 694. Although a municipality may be liable for failure to train its employees, such a failure results in liability only if it amounts to "deliberate indifference" to the rights of those with whom the employees come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014). The failure to train municipal employees ordinarily rises to deliberate indifference only where the failure has caused a pattern of violations. *Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000). In addition, the "identified deficiency in training must be closely related to the ultimate injury." *Thomas*, 749 F.3d at 222 (quoting *Harris*, 489 U.S. at 391).

A plaintiff alleging that a municipality's failure to train amounts to deliberate indifference must show that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (adopting the Second Circuit's test in *Walker v. City of N.Y.*, 974 F.2d 293, 297–298 (2d Cir. 1992)). Although it is possible to maintain a failure to train claim without a pattern of violations, the burden on the plaintiff is far higher. *Connick v. Thompson,* 563 U.S. 51, 62 (2011). In the rare case, the need for training "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional violations" even without a pattern. *Connick*, 563 U.S. at 63 (quoting *Brown*, 520 U.S. at 409; *Harris*, 489 U.S. at 390 n.10).

Scott avers that the City failed to train its correctional officers how to "respon[d] to mentally ill inmates who exhibit behaviors consistent with their mental illness."[18] The City moves to dismiss Scott's failure to train claim because he does not plead a policy or custom and identify prior instances of similar misconduct at a PPS prison. Scott responds that no "articulated policy or observed pattern or practice" is necessary because the City's failure to train its correctional officers amounts to deliberate indifference.[19] In support, he cites a Department of Justice (DOJ) estimate that 64 percent of inmates in county jails suffer from mental illness.[20] As Scott argues, this statistic supports an inference that PPS correctional officers are likely to encounter mentally ill inmates in the performance of their duties. He also cites DOJ statistics showing that mentally ill inmates are more likely to be injured in an altercation or be charged with violating prison rules.[21]

These statistics show that there is a need to train correctional officers how to respond to mentally ill inmates behaving consistently with their illness. But, they do not demonstrate a lack of training. Nowhere in his amended complaint does Scott allege any facts which, if proven, would show that the correctional officers were not adequately trained. He makes bald conclusions.

---

[18] TAC at ¶ 72a.

[19] Pl.'s Opp. to Mot. to Dism. at 8.

[20] TAC at ¶ 69 (citing U.S. DEP'T OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, MENTAL HEALTH PROBLEMS OF PRISON AND JAIL INMATES 1 (2006), *available at* https://www.bjs.gov/content/pub/pdf/mhppji.pdf (last visited April 1, 2019)).

[21] *Id.* at ¶¶ 70-71 (citing U.S. DEP'T OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, MENTAL HEALTH PROBLEMS OF PRISON AND JAIL INMATES 10).

The City also argues that Scott does not identify a policymaker. The City is correct. However, we do not believe that this omission is fatal to Scott's claim in light of the potential difficulty in identifying the relevant policymaker at this early stage.

Scott claims that he is now in possession of documents that support his failure to train claim. He asks for leave to amend his complaint to assert the facts contained in these documents. In light of the liberality of Rule 15(a), we shall allow Scott to amend his complaint to flesh out his failure to train claim. If he elects to do so, Scott must plead facts which, if established, demonstrate that the City failed to train PPS correctional officers how to deal with mentally ill inmates.

## Conclusion

Scott has not stated causes of action against the City for violation of the ADA or failure to train. Therefore, we shall grant the City's motion to dismiss and grant Scott leave to amend his complaint in support of his failure to train claim.